

**Littler Mendelson, P.C.**
375 Woodcliff Drive
Suite 2D
Fairport, NY 14450


Jessica F. Pizzutelli
585.203.3403 direct
585.203.3400 main
585.486.1605 fax
jpizzutelli@littler.com

August 25, 2022


**VIA ECF**

The Honorable Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East, Room 1230
Brooklyn, New York 11201


Re:   Marin, et al. v. Apple-Metro, Inc., et al., No. 12 Civ. 5274 (E.D.N.Y.)
      Dove, et al. v. Apple-Metro, Inc., et al., No. 13 Civ. 1417 (E.D.N.Y.)


Dear Judge Pollak:

We write to respond to Plaintiffs' August 4, 2022 letter brief concerning Plaintiffs' demand that Defendants[1] produce a "line-item breakdown" of a service provider's estimated cost to produce timekeeping data for thousands of employees dating back more than 15 years. *See Marin* ECF Nos. 355, 357, 360, and 363. Plaintiffs not only claim that the service provider, Rosnet, has failed to provide sufficient detail about the cost to produce these reports, but also claim that Rosnet has "astronomically inflated" its cost estimate.[2] Plaintiffs' claims are based on the assumptions of a data scientist who: (a) is employed by Plaintiffs' counsel, (b) has no hands-on experience with Rosnet's proprietary databases, and (c) purports to understand Rosnet's databases and processes from perusing Rosnet's website.[3]

Defendants have attempted to be cooperative in discovery. Defendants provided extensive information on Rosnet data, including producing several sample reports to Plaintiffs. Those sample productions, which were for very limited timeframes (*e.g.*, one to six weeks) and for a single restaurant,

---

[1] We write on behalf of all Defendants except the individually named Defendant, Samlal.

[2] *See* Declaration of Dylan Marlborough in Support of Plaintiffs' Discovery Letter (hereinafter, "Marlborough Decl."), at ¶ 8.

[3] Defendants note that, based on his LinkedIn profile, Plaintiffs' Data Scientist Dylan Marlborough is a recent college graduate whose work experience consists of working as a Financial Data Analyst and Intern.

The Honorable Cheryl L. Pollak
August 25, 2022
Page 2

illustrated the large volumes of data contained in many of the reports requested by Plaintiffs. Defendants have also explained that pulling and producing the reports requested by Plaintiffs for all restaurants from both archived and live databases going back to October 2006, is a complex undertaking that will likely require approximately 300 hours of hands-on work by software developers, database architects, and other technical personnel.[4] The reports that Rosnet will develop for Plaintiffs are not "canned reports" and the data being requested cannot be obtained through existing queries. Rosnet has never provided a data set this extensive – *i.e.*, spanning over 15 years enterprise-wide – and doing so will require the full breadth of its employees' specialized knowledge and experience to ensure that the data is correct and complete.

It is, therefore, unreasonable and presumptuous for Plaintiffs to allege that this project will only require "minimal" custom code and that "basic cleanup operations" are "fairly straightforward" for data spanning over 15 years for thousands of employees.[5] Plaintiffs cannot justify their assertions concerning Rosnet's processes for pulling data and ensuring data integrity. Instead, Plaintiffs have weaponized Defendants' good faith disclosures and baselessly claim that Defendants' long-time service provider has purposely (and inexplicably) inflated its cost estimates. The Court should reject this behavior by denying Plaintiffs the relief sought – a "raw" dump of potentially incomplete and inaccurate data.

At the end of this letter, Defendants set forth an alternative proposal that they intend to explore with Rosnet.

1. **Background**

Rosnet delivers technology solutions specifically for restaurant operators like Defendants by integrating with multiple systems, collecting, and aggregating data from those systems, and providing reporting and analytics about restaurant business operations, labor and inventory management, payroll, budgets, and more. Since July 2007, Rosnet has integrated with Defendants' systems to collect and provide "standard" and *ad hoc* reports and forecasts about sales, employee time and attendance, payroll, and/or labor for almost 30 Applebee's® restaurants.[6] During the relevant time period, Rosnet has made four (4) major system version changes. Contrary to Plaintiffs' assertions, such changes are not limited to "cosmetic" formatting changes or adding fields.

---

[4] *See* Exhibit A to ECF No. 364.

[5] Marlborough Decl. ¶ 14.

[6] Defendants' POS and payroll systems have changed over time, but Defendants have used Rosnet to collect and aggregate data from these systems since July 2007.

The Honorable Cheryl L. Pollak
August 25, 2022
Page 3

In May 2022, after months of conferring about electronic discovery, including Defendants' production to Plaintiffs of sample Rosnet reports, Plaintiffs requested that Defendants produce the following reports for all of Defendants' restaurants and employees, from October 22, 2006 to the present:
- Employee Punch reports;
- Employee Payroll Summary reports;
- T.R.A.C. Detail reports; and
- Sales/Labor Summary reports.

Shortly thereafter, Rosnet provided Defendants with a Statement of Work ("SOW") that outlined the estimated timelines and estimated hours and cost to prepare and produce the four (4) reports. A copy of that SOW is being filed herewith, under seal.[7] Pursuant to the existing Master Service Agreement between Defendants and Rosnet, effective July 2, 2007, the SOW set forth an estimate of 8 to 12 weeks to complete the project at substantial cost. Defendants also inquired into whether the time and cost to produce records would be reduced if limited to the opt-in Plaintiffs, and Rosnet responded that such a limitation would not result in any cost-savings because searches for data for over 1,000 employees over the same time period would involve the same level of complexity.

On June 9, 2022, Plaintiffs asked for a line-item breakdown of the components comprising the time and cost estimate, and subsequently provided examples of the type of line-item detail sought, which included:
- A bid from an eDiscovery software vendor;
- A bid from a settlement administrator notice; and
- A quote from an electrician to replace two fans in Plaintiffs' counsel's home.

Defendants explained that Plaintiffs' examples were inapposite. Rosnet is not: processing and hosting data on an eDiscovery platform, sending out settlement notices, or replacing ceiling fans. Notwithstanding, Defendants conferred with Rosnet and provided additional information about the basis of Rosnet's cost and labor estimates, including that a significant number of labor hours will be required to examine the archived and live data, write custom data queries, test and perform quality controls throughout the process, and prepare the consolidated deliverables.

Plaintiffs' response was to demand that Defendants further investigate and negotiate the cost of Rosnet's services,[8] specifically the details of Rosnet's proprietary testing and validation processes. Plaintiffs did not propose "various ways to reduce cost," but rather, suggested that Rosnet dump raw,

---

[7] Defendants respectfully request leave to file **Exhibit A** under seal. The SOW is marked "CONFIDENTIAL – DO NOT DISTRIBUTE" and is also designated by Defendants as "Confidential" under the parties' Confidentiality stipulation in this case.

[8] Rosnet's rates for preparing the requested reports are consistent with similar requests for custom reports, and the hours estimates for each report are based on an evaluation of the request, including known or anticipated technical complexities, by experienced Rosnet personnel.

The Honorable Cheryl L. Pollak
August 25, 2022
Page 4

unvalidated data and allow Plaintiffs' counsel's in-house data scientist to "clean up" and analyze that data.

### 2. Plaintiffs' Claims are Based on Erroneous Assumptions

The Court should reject Plaintiffs' gross oversimplification and misrepresentation of the complexity and level of effort required to produce these historical reports. Plaintiffs' statements to the Court are based on wholly erroneous claims about a proprietary system, about which Plaintiffs and their data scientist have limited information. Among the many misstatements and assumptions are the following:

- Rosnet's reports are "canned," so existing queries can be executed there is no need for Rosnet to develop custom code to query the database.[9]
- "Rosnet can simply run a separate query for each iteration of the database, and the result would be multiple spreadsheets containing the same data, with slight differences in formatting."[10]
- Rosnet's labor hours for "data cleaning" are unnecessary because Plaintiffs' in-house data scientist can do data cleanup, which is purportedly "fairly straightforward."[11]

In fact, during the parties' conferrals, Plaintiffs' counsel (in consultation with their data scientist) posed several questions to Defendants about how to interpret the sample reports produced to Plaintiffs.[12] In addition to asking about what certain fields represent and the sources and relationships among certain data, Plaintiffs also asked to "review the settings for Rosnet and other data systems that were used (or requested from the vendor) by Defendants" and "the user interface, forms, dashboards, or portals used, either by employees or management, to access these features" so that Plaintiffs could determine the meaning of the reports' contents.[13] These requests show that Plaintiffs and their data scientist do not have the familiarity – let alone the requisite expertise – to opine on how to extract, produce, "clean up," and analyze Defendants' Rosnet data.

To be clear, Rosnet has never undertaken a search for data spanning a 15-year period across all iterations of the system. As explained above, Rosnet has made numerous changes and enhancements during the past 15 years that impact its ability to pull the data requested by Plaintiffs. Indeed, the fact that the data fields being sought are the same data fields for the 15 years does not render this task any simpler because the data is contained across multiple archives and databases, each requiring custom efforts. Moreover, there are many "unknowns" with respect to older data, including for example

---

[9] Pls'. Letter Brief at 3; Marlborough Decl. ¶ 10.

[10] Pls'. Letter Brief at 3; Marlborough Decl. ¶¶ 7, 11.

[11] Marlborough Decl. ¶ 14.

[12] *See* **Exhibit B** at pp. 2-4 (January 21, 2022, letter from Plaintiffs' counsel to Defendants).

[13] *Id.*

The Honorable Cheryl L. Pollak
August 25, 2022
Page 5

formatting issues that could make it difficult for reports to be ingested cleanly and the possibility that, within each of the database tables, the actual data for the time periods requested may have been moved to archiving tables, which would require additional work by Rosnet employees to ensure that the data from these archiving tables is properly queried.

Moreover, there are four separate requested reports, and each report must be custom-built using data points pulled from multiple databases with multiple tables. Rosnet cannot simply use preexisting queries or run separate queries for purported iterations of the database. Developing the requested reports involve complex processes, including to ensure that the reports are accurate. All of this adds to the work that will be required of Rosnet employees to obtain the data that is requested (*i.e.*, this is employee time, not machine time). The amount of time required to complete the project and the complexity of the tasks involved are directly related to these "unknowns" about historical data, the breadth of the reports, the temporal scope of the reports, and the volume of data. All of the tasks required to produce the reports Plaintiffs have requested will require Rosnet employees' specialized knowledge and experience to ensure data integrity.

Plaintiffs' proposed data "cleanup" shortcut is completely unsound and fraught with risk to both parties if relied upon to prove or refute any legal claims. It would be inappropriate to compel Rosnet to discard critical processes and procedures to properly pull and validate the completeness and accuracy of data from its proprietary systems. Similarly, it would be unreasonable to permit Plaintiffs' novice data scientist to perform "data cleaning," which could result in inadvertent data alteration or substantial and consequential data errors. In short, Plaintiffs' unorthodox end-run around the proportionality factors presents unnecessary and significant risks that could compromise the integrity of Defendants' data.

### 3. Plaintiffs Cannot Dictate Defendants' Methods of Production

Defendants have engaged in good faith negotiations over the types of Rosnet reports to be produced, but such efforts at cooperation do not mean that Plaintiffs have *carte blanche* to manage the process.[14] Plaintiffs' unfounded belief that extraordinary volumes of data from Rosnet can and should be produced in a "raw" form using pre-existing queries *sans* data validations is illogical.

As Plaintiffs already know, "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically

---

[14] *See* The Sedona Conference, *The Sedona Principles, The Sedona Conference Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, Principle 6, 126 (2018) (explaining that a responding party's obligation "to meet and confer in good faith does not trump its right to evaluate unilaterally and select the procedures, methodologies, and technologies appropriate for preserving and producing its own ESI."); *The Case for Cooperation*, 10 Sedona Conf. J. 339, 344-45 (2009) ("Cooperation […] requires forgoing the short term tactical advantages afforded one party to information asymmetry [… and] it forbids making overbroad discovery requests for purely oppressive, tactical reasons.").

The Honorable Cheryl L. Pollak
August 25, 2022
Page 6

stored information."[15] The Court should reject Plaintiffs' attempt to commandeer Defendants' discovery processes and, instead, as set forth below, allow Defendants to explore collecting and producing a defensible and proportional sample of Rosnet data.

### 4. Proportionality and Reasonableness Must Drive the Parties' Approach to Discovery

Any discovery in this matter must comply with basic elements of proportionality that are designed to keep wasteful excesses of costly discovery in check while permitting useful and efficient discovery to proceed. Plaintiffs, however, not only insist on voluminous ESI productions of potentially incomplete or inaccurate data, but also paradoxically claim that some or all of that ESI has been falsified or manipulated by Defendants.[16] Indeed, Plaintiffs (falsely) argued that extensive email collections and review were necessary because Defendants' structured data had been allegedly fabricated and could not be trusted. After Defendants have spent **over $100,000 on email and unstructured data productions**, and recently produced **thousands** of documents, Plaintiffs now demand that Defendants incur tens of thousands of dollars more (see Ex. A) on Rosnet reports that they claim are allegedly falsified. Enough is enough.

In addition, notwithstanding Plaintiffs' baseless allegations of misconduct, the burden of producing data going back to 2006 for all of Defendants' restaurants is outweighed by the benefits of doing so.[17] As set forth in Defendants' prior letter to this Court (*Marin* ECF No. 357, incorporated by this reference):

- It makes no sense for Defendants to go through the burden and expense of producing such large swaths of data that Plaintiffs themselves claim (albeit falsely) is unreliable.
- Plaintiffs make no showing that the voluminous, individualized data that Plaintiffs seek (and which they are not entitled to as no class has even been certified in this case) is necessary or

---

[15] The Sedona Conference, *The Sedona Conference Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, Principle 6, 126 (2018); *see Hyles v. New York City*, 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016) (holding that "the responding party is best situated to decide how to search for and produce ESI responsive to [plaintiff's] document request"); *Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 427 (D.N.J. 2009) ("The Sedona Principles wisely state that it is, in fact, the producing party who is the best position to determine the method by which they will collect documents. . . . absent an agreement or timely objection, the choice is clearly within the producing party's sound discretion.").

[16] *See* **Exhibit B** at p. 4 (January 21, 2022, letter from Plaintiffs' counsel to Defendants); First Am. Compl. ¶¶ 94, 98-100.

[17] *See Winfield v. City of New York*, No. 15CV05236LTSKHP, 2018 WL 2293070 (S.D.N.Y. May 18, 2018) (denying Plaintiffs' demand for a database where production of the database was not likely to provide useful additional information to Plaintiffs); *see also Wood v. Capital One Servs., LLC*, No. 5:09 Civ. 1445 (NPM/DEP), 2011 WL 2154279, at *3 (N.D.N.Y. Apr. 15, 2011) ("[t]he rule of proportionality serves to protect a party against having to produce voluminous documents of questionable relevance."); *Kinon Surface Design v. Hyatt Int'l Corp.*, No. 19 C 7736, 2022 WL 787956 (N.D. Ill. Mar. 15, 2022) (in denying plaintiff's motion to compel, emphasizing "the importance of the issues at stake in the action" and "whether the burden or expense of the proposed discovery outweighs its likely benefit" as being particularly determinative of plaintiff's discovery motion, as well as the importance of determining whether there is an "actual need" for the requested discovery).

The Honorable Cheryl L. Pollak
August 25, 2022
Page 7

- required for purposes of class certification. Plaintiffs do not, and cannot, identify any questions with a common answer that can be addressed by the individualized and voluminous time and pay data they seek. Indeed, in *Dove,* Plaintiffs allege that Plaintiffs entered inaccurate tip amounts into the POS system. The reports that Plaintiffs seek do not establish the truth or falsity of this assertion, nor can they provide a common answer supporting class certification. Similarly, in *Marin*, Plaintiffs allege that Plaintiffs worked off the clock. None of the reports that Plaintiffs seek show whether any Plaintiff allegedly worked off the clock. Bottom line: None of the reports that Plaintiffs seek are designed to provide answers to any purported class-wide questions.
- What's more, Defendants *have* produced time and payroll records for numerous opt-ins in this litigation, and Plaintiffs have made *no showing whatsoever* as to how the records that were *already produced* are relevant to the issue of class certification. One would think that Plaintiffs would have cited or attached those documents to their submission and explained their relevance to class certification issues in support of their need for *over 15 years' worth of similar data*, but they did not. This omission is telling.

**5. Defendants' Proposal to Resolve the Parties' Dispute**

As noted above, Defendants have recently incurred great expense to produce thousands of documents responsive to Plaintiffs' discovery requests and that relate to the core issues in this case. In prior productions, Defendants have likewise produced thousands of documents, including compensation reports and punch records for certain opt-ins. Defendants respectfully submit that, at this point in the case, where no class is even certified, Plaintiffs have more than enough information to determine whether to file a motion for class certification. Instead, Plaintiffs continue to improperly demand cumulative and burdensome discovery from Defendants.

Nevertheless, Defendants believe that proportional discovery of structured ESI may be achieved. To that end, Defendants propose meeting and conferring with Plaintiffs to determine a reasonable sampling of pay and time records from a sample of restaurants. Defendants will then work with Rosnet to identify the most cost-efficient method for production of same.

The Honorable Cheryl L. Pollak
August 25, 2022
Page 8

### 6. Conclusion

Plaintiffs' current "boil the ocean" approach to discovery is simply untenable and illustrates their intent to weaponize discovery. For the reasons stated above, the Court should deny Plaintiffs' request outright and reject their purported "cost-saving" measures.

Respectfully Submitted,

*/s/ Jessica F. Pizzutelli*

Jessica F. Pizzutelli

JFP/wp
Exhibits A-B

CC: All counsel of record (via ECF and email)